ALBERT FRANKLIN V. THE STATE.

*No. 3258. Decided February 13.*

1. **Murder—Charge of Court—Manslaughter.**—On a trial for murder where the undisputed evidence disclosed that deceased and defendant were strangers, that the difficulty began in the house of deceased at a late hour of the night, that deceased was seen fleeing from his house and defendant pursuing and striking him in the back with a knife, and finally at the railway track cut his throat, killing him instantly; and it further appeared from the undisputed evidence that at sometime during the fight defendant had himself received a very dangerous incised wound in the bowels; that prior to the fight he had been lying on the bed, and that there was blood on the bed, and quantities of it on the floor of the house, and defendant had testified that he was stabbed by deceased while lying on the bed, and that this was the beginning of the fight; *held*, that if deceased stabbed defendant while the latter was in bed and then abandoned the fight and fled, and defendant pursued and killed him, and such killing was the result of passion produced by the cutting defendant had thus received, then the homicide would be manslaughter and not murder, and the charge of the court should so in effect have instructed the jury.

2. **Perfect and Imperfect Right of Self-Defense.**—A party may have a perfect right of self-defense, though he may not be wholly free from blame in the transaction; the question being, What is the nature of the blame? If the blame or wrong was not intended to produce the occasion, nor an act which was under the circumstances reasonably calculated to produce the occasion, or provoke the difficulty, then the right of self-defense would be complete, though the act may not be blameless. But if the act was a violation of the law, and was reasonably calculated to produce the occasion, then the right of self-defense would be abridged.

3. **Same—Imperfect Self-Defense.**—Where the defendant was found in the house of deceased under suspicious circumstances at a late hour of the night, and his acts and purposes were wrongful though not illegal, and were such as to produce the occasion or provoke a difficulty, which brought about the necessity of his taking the life

of the deceased, *held*, that his right of self-defense would be imperfect, because his acts were wrongful, and that the homicide would be manslaughter.

4. **Perfect Right of Self-Defense.**—If defendant was at the house of deceased simply for the purpose of securing some place to sleep that night, and by permission of the wife of deceased laid down on a bed in a room adjoining that of the wife to await the coming of the husband, while such conduct may have been imprudent, still if such were alone his purpose he would not be guilty of even a moral offense or wrong. And if when deceased returned he assaulted the defendant while on the bed, and to save his own life defendant killed deceased, such killing would be justifiable under a perfect right of self-defense.

APPEAL from the District Court of Bexar. Tried below before Hon. G. H. Noonan.

This appeal is from a judgment of conviction for murder in the first degree, wherein the penalty was assessed at death. All of the facts in the case are copied in the opinion of the court.

No briefs on file for either party.

HURT, JUDGE.—Appellant was convicted of murder in the first degree, and the death penalty assessed. To a clearer understanding of the case, we deem it necessary to give a statement of the facts developed on the trial below.

J. M. George, for the State, testified: "I live at West End, San Antonio, Bexar County, Texas. I knew the deceased, William Robinson, in his lifetime. He had been working for me five or six months. He was living at my house. His wife lived about a mile from me, at the edge of town, near the International & Great Northern Railway track. I last saw deceased alive about 6 o'clock on the evening of June 30. I paid him off then, and he was going to town to buy some things to take home with him. When I saw him again, next day, he was dead. He had been cut three or four times in the left breast, in the region of the heart; once in the right breast, and his throat was cut from the ear, around the throat, to nearly the opposite side. He was also cut in the bowels. I know the knife that deceased carried. I had seen him with it quite often, working in my garden with it, pruning and cutting trees and rose bushes. I had his knife quite often in my hand. I would take it from him to show him how to do the work." [A pocket knife, hereafter shown by the testimony of A. J. Smith to have been taken from the defendant, was here shown the witness.] The witness then said: "This is not the knife of deceased. I never saw the deceased with such a knife, or knew of his owning such a one. His knife was much smaller than this one."

Cross-examined: "I can not say that deceased did not have this knife. I never saw him with it. He might have owned it without my knowing it."

Dr. George Clifford, for the State, testified: "I am county physician of Bexar County. I found on his body four cuts in the left breast, in the region of the heart; one on the right breast; a cut in the abdomen, from which the bowels protruded; and his throat was cut from a point commencing near the left ear, circling round the throat, to nearly the opposite side, severing the windpipe and both jugular veins. I don't think the breast wounds would have been necessarily fatal. The throat-cut severed all the arteries and the windpipe, and produced immediate death. After the throat-cut, deceased would not have been able to speak or utter a cry. I examined the body at the instance of the coroner. I did not examine the back of deceased for any wounds. The coroner merely wished me to ascertain the cause of death. The wounds were all made with a sharp-pointed instrument." The knife heretofore referred to was here shown the witness, who said: "All the wounds could have been made with an instrument like this, or with this knife. I found the body lying in Bexar County, Texas."

Cross-examined: "I had occasion to examine the defendant. My examination was made to see whether he should remain in the hospital or be removed to the county jail. The defendant had been cut, and his bowels protruded. They were replaced and the wounds stitched up by Dr. Oldham. The wounds were made with some sharp-pointed instrument. They could have been made with the knife shown me. The wound was about two inches long, and a dangerous one. I examined him after he had been operated upon."

Mrs. Maria Burks, for the State, testified: "I knew the deceased for a long time. He is dead. I knew his wife, Emma Robinson, and the defendant. Have known defendant for some months. I was living near Robinson's at the time he was killed—about a block from them. I had been living there one month and one week before the 16th of June. Emma Robinson was living there before I moved next to them. I remember the night William Robinson was killed. It was on Saturday night, May 30 last, about 2 o'clock. At that time Emma Robinson came to my house and rapped at my door, which woke me and my husband up. She came in with her four children. When I opened the door she ran in with the children. She was excited—caught me around the shoulders, the children catching me around the waist. She said defendant and deceased were in the house, fighting. A moment or two after I opened the door I heard screams of pain in the direction of Robinson's house. The screams were: 'Oh! Oh! Oh! Help!' These screams were made by the voice of William Robinson. I recognized them at the time, and said: 'My God! That is Billy screaming!' The screams were on the outside of Robinson's house, and didn't sound as if made at the same place, but as though they were going away, further and further, down toward the railway track. Then, when the screams ceased, everything was quiet. I afterward saw the

body of the deceased, that same night, before it was moved. It was lying near the railway track, not far from Robinson's house. This was the same direction from which I heard deceased screaming. When I went there the justice of the peace had come. I tried to help lift the body. His throat was cut, and he was cut all over. I went to Robinson's house afterward. There was some blood on the sheets in the front room. I have seen deceased at Robinson's house four times. Robinson would not be there. Once I saw him in the back room, eating. This was the room in which the meals were taken. The other three times I saw him lying down on the bed in the front room. I know Franklin's knife. It is a large, black, wooden-handle pocket-knife, with two blades." The knife heretofore referred to was shown the witness, who said: "That is Franklin's knife. I know that knife. I borrowed it from him four times—once to cut my corns, twice to cut tooth-brushes, and once to cut an orange. Every time I borrowed it I told him he had no business carrying such a knife; that it was an awful knife, and he ought not to carry it. All this took place in Bexar County, Texas."

Cross-examined: "Once I saw Franklin eating at Robinson's. I can't remember the date. The other times I saw him there he was lying down on the bed. He wasn't bothering anybody when I saw him there. I can't tell the dates he was there, but it was just four times. One of the times must have been Thursday or Friday before the killing. I don't know the dates I borrowed Franklin's knife, but I know it was four times. Of course I know what I borrowed it for each time. Once when I borrowed it there was a woman there. She stopped in as she was going by, to rest. I don't know her name. I passed her once since on the street near Wolfson's store. G. Smith was there once when I borrowed the knife. He lives here in town. I saw him here this morning. Franklin had been in my house five or six times after we moved next to Robinson's, and he had been at my house before we moved. My husband first brought him there. He said he was tired several times, and I made him down a cot to rest. This would be in the day-time. His work was at night. He got too familiar with me, and I sent him away about his business and wouldn't let him stay about the house any more. I didn't tell my husband that Franklin had tried to be too familiar with me, and one Sunday, after I had sent him away, my husband brought him back, and let him rest on a cot in the back room; and as soon as I saw him I made him get up and leave, and told my husband I didn't want him about there. It was exactly 2 o'clock when Emma Robinson came to my house. My clock is not a striking clock. I don't know that it was right, but I do know it was 2 o'clock, because I looked at it."

A. J. Smith, witness for the State, testified: "I knew William Robinson for a long time. I lived about twenty-five feet from his house at the time of his death. I knew the deceased [defendant?] about one

week before the killing of Robinson. I had a reception at my house on the night of the killing. This was on Saturday night, May 30, 1891. The reception was going on when I heard talking going on in Robinson's house. This was between 1 and 2 o'clock in the morning. Then I heard a rumbling kind of noise in the house. I was in the front of my house when I heard the rumbling noise. I took notice. I then heard cries in the house, and saw two men coming out of Robinson's yard. One man was ahead of the other. The man at the rear was hitting at the man in front. I could see him raise his hand and strike, and I could hear the sound. It sounded like a man hitting his fist on a piece of plank. Every time the man in the rear would hit, the man in front would cry, 'Oh!' I recognized the voice of the man in front to be that of Robinson. The man in the rear was Franklin. I took it to be him because he was the tallest of the two. When they got across the railway track —a distance of about twenty-five steps from Robinson's house—they fell down; and I could still hear the licks, followed each time by the exclamation, 'Oh! Help!' They then seemed to be in a bulk. The last I heard was a gurgling sound, and then the cry ceased. I then saw a man get up from the bulk and come toward me. I stepped back to my house, and the defendant came along the railway track toward me. This was the same man who got up from the place where the man was crying, 'Oh!' and where the deceased was found. There was no other person there. He had a bloody knife in his hand, and I took it from him.'' The knife heretofore identified by the witness Mrs. Burks was here shown the witness, who said: ''This is the same knife I took from defendant. The blood on it is now dry, but it was then wet and fresh with blood. I turned the knife over to the police when they came. The ground from Robinson's to the railway track was rough—partly down hill and weedy. I went with defendant to Fest's store. John Fumeny and Charley Moore went with me. Some one telephoned for the police, and they came. The defendant had a cut in his side, and his hands were cut. He was suffering a great deal. I went back with the police, and we found the body of William Robinson by the railway track, with the head near the rail. This was at the same spot from where the defendant came with the knife, and where they had fallen down. The throat of the deceased was cut, and he was stabbed in the breast, in the bowels, and his finger was cut. We looked in the house, and on the line they had taken from the house to the body, for another knife, but found none. After the killing I saw blood on the bed and the floor in the front room of Robinson's house, where I had heard the rumbling noise. All this happened in Bexar County, Texas.''

Cross-examined: ''I have not talked over my testimony with Mrs. Burks. We talked about how cold-blooded a murder it was. Defendant was suffering a great deal, and wanted to be carried to the hospital.''

John Elliott, a witness for the State, testified: "I knew William Robinson on the night of the killing. I was at the house of Mary Jones. A. J. Smith was there. He lived there, about twenty-five feet from Robinson's. Charley Moore was also there. They were having a reception. I had laid down on the gallery and gone to sleep. My wife waked me up, and I heard cries of 'Oh! Oh! Oh! Help!' I saw two men come out of Robinson's, one following the other. I heard a sound like a tearing of cloth before each cry of 'Oh!' One man followed the other to the railway track and they fell. Then I could still hear the licks, and the cries of 'Oh! Oh! Oh! Help!' Then I heard a gurgling sound, and then all was still. I then saw the defendant coming from where the dead body lay. He called for A. J. Smith, saying, 'Is that you, A. J. Smith?' Franklin walked up to me. I was in front. He came up to me right after I heard the gurgling sound and said: 'A man came up to me while I was asleep in bed, and run a knife into my belly, like lightning. If you don't believe I am cut, look here.' He then said, 'I guess he is down there on the track somewhere.' We searched there to find another knife, but could not find any except the one defendant had."

Cross-examined: "When the two men came out of the gate I did not see a knife. It was too dark for that. I could hear the blows, but could not see them. The blows sounded like the tearing of cloth, followed by the cries of 'Oh!' The defendant came right up to me. Smith and all the rest seemed to be afraid. We looked all around there, in and out of the house, but could not find a knife. I looked at the front room. There was a light sprinkling of blood on the sheets, and larger quantities on the floor. The bed looked pretty well mussed up—looked as if two people had been sleeping in it. I did not see deceased's wife around there until the police came. This was about an hour after the killing. I made the remark, 'Where is his wife?' and she said, 'Here I am.' Don't know how long she had been there. She wasn't crying, and showed no signs of grief."

James Shelby, a witness for the State, testified: "I am an undertaker. I helped to prepare the body of William Robinson for burial. He was buried in the clothes he died in. There were four or five cuts or stabs in the back of the deceased. They cut through the clothing and into the flesh. I did not examine to see how deep they were. They were in the left shoulder-blade."

Mrs. Mary Selcher, a witness for the State, testified: "I live about twenty yards from Mrs. Robinson's. On the night of the killing there was first a noise in the house, like fighting. Then there were screams that sounded like they were on the outside. The screams were awful loud, and sounded like some one was being hurt awful bad. It was at night. I was in my house, and didn't see anything. This was in San Antonio, Bexar County, Texas."

Walter Beck, a witness for the State, testified: "I am a mounted policeman. I was called up on the night of May 30 last to go to John Fest's store. I found the defendant there. He was lying down. Had been cut, and seemed to be in great pain. I received no information from him. A. J. Smith handed me a pocket-knife at the time I went to Fest's. It was covered with blood. [Witness here identified the knife heretofore in evidence.] Smith then went with me up the railway track, and I found the body of William Robinson lying on the side of the track, with head on the rail. I did not particularly examine the body. I saw that his throat was cut, and that there were several other cuts in the chest and bowels. I moved the body in the house. In the front room there was lots of blood. Some on the bed and some on the floor. The bed looked as if it had been used—just slightly rumpled. I made a search inside and out for another knife, but could find none. The deceased was not armed. Defendant was taken to the hospital. All this took place in Bexar County, Texas."

Dr. Oldham, a witness for the defendant, testified: "I am assistant city physician. Was called to attend the defendant at the hospital. Found him cut in the abdomen, with the bowels protruding. The cut was about two inches long. I put the bowels back and stitched up the wound. Nothing was cut on the inside. It was a dangerous wound. The defendant was also cut across the fingers of the inside of both hands. These cuts were all fresh, and must have been made at the same time. These cuts were all made with a sharp-pointed instrument, and could have been made with the knife shown me."

Cross-examined: "The cut in defendant's abdomen is on the left side. The cut was made by a down stroke, the cut being from up, downward. The bowels were not cut.

"Q.—If defendant were running after deceased at night, with the knife shown you in his right hand, cutting at the left shoulder-blade of deceased, while running over rough, weedy ground, and down-grade, could that cut not have been self-inflicted, if defendant should miss the mark of deceased's back?

"A.—Yes, it would be possible to inflict the wound upon himself in the manner indicated. It is not probable that it was inflicted intentionally. It may have been inflicted accidentally."

Emma Robinson, a witness for the defense, testified: "On May 30 last I lived about Mr. Fest's, in the city of San Antonio, Texas. I knew William Robinson. He was my husband. He is dead. I last saw him on Saturday night, the last of May. I next saw him, dead, near the International & Great Northern Railway track. I saw the defendant on that Saturday night. He and Robinson met at my house on that night. The defendant came to my house about 5 o'clock in the evening. Said he wanted a place to board. He staid there and talked. I was at work. He said he was tired, and wanted a place to stay. I said, 'You must see

my husband. My husband will be at home this evening, and you can see him about sleeping here.' My husband said he would come home early, so we could go down town and get some things for the children. My husband did not come until late. When he came I was in the back room with my children. The defendant was asleep in the front room. My husband knocked at the door, and I went to open it for him. When he came in and saw the defendant he made a rush upon him. I called to him twice, 'Stop until I tell you,' but he would not wait. They began fighting, and I went out of the house, yelling. Took my children, got out of the window, and went to Mrs. Burks' house, and told them what was going on. I did not see any knife in my husband's hands, and did not see any in the hands of defendant. The defendant's conduct to me was all right. He was not undressed when I laid down. I was in the back room with the children; he in the front room. They met in the front part of the house. He asked this defendant what he was doing, and told him to get out—jumping on the defendant. I have seen my husband with a knife like this one shown me."

Cross-examined: "I don't know what the color of my husband's knife was, or how many blades it had. I don't know if it had one, two, three, or four blades. I don't know how large it was. I don't know how many blades the knife just shown me has, or the color of the handle. I don't know if my husband's was an IXL knife. I won't say that is my husband's knife. I first met the defendant last August at the San Pedro Springs. My husband was not with me. My husband didn't know I knew him. My husband didn't know him. He had been to my house several times before that. My daughter Mamie is 11 years old. She was in the front room with me when I opened the door to let my husband in. The defendant was standing up in the front room when I opened the door. He was not asleep when my husband came in, and my husband didn't stick a knife in him when he was asleep, or at any other time while I was there. When I went to go through the room to open the door the defendant was sitting on the side of the bed. By the time I had opened it, he was standing up. The defendant was not standing behind the door when my husband came in, and my daughter Mamie didn't see him there. The defendant did not come from behind the door and advance on my husband, and then my husband grappled with him. My husband caught him by the legs with his hands. There was nothing in my husband's hands when he did this. The door that my husband knocked at was not latched or locked. I don't know why he knocked. He could have come in without knocking. He came home nearly every Saturday night. I knew he was coming home that Saturday night. He sent me word by Isaac Burks that he was coming home. When Isaac Burks told me he was coming home, I did not say to Burks in reply, 'I know it; and if he don't come home all right my sporting man will be here,

and do him up.' I didn't say that to Burks. We only had two rooms in the house. The defendant was waiting for my husband to come home, to ask him to stay there all night. It was about 2 o'clock when my husband got home. Burks and his wife were asleep when I went to their house. It was further to their house than it was to Mary Jones', where the reception was going on. I didn't go to the nearest place, where the people were up, because I wanted to go to some place where I knew them better. I don't know if I could have saved my husband's life by going to the nearest place for aid. I never went back to the house since I left it that night. I didn't keep an eating house or a lodging house."

Redirect: "I never saw the defendant, since that night, until I saw him here in the court room. My daughter Mary has been kept away from me by the district attorney."

Recross-examination: "I don't believe I knew what I said when I said my daughter had been kept away from me by the district attorney. She has been in the country with her grand-parents, and the sheriff had to bring her in, as they had no other way of sending her. She was sworn with the other witnesses, and placed in the charge of the sheriff."

The defendant, Albert Franklin, testified for himself, as follows: "I did not know William Robinson. I knew Emma Robinson, his wife. I was at her house on Saturday, the 30th day of May. I had been at work on the International & Great Northern Railway from Encinal to Hutto. Got here on the 17th day of May, and left again on the 20th, and came back on the 23d of May. On May 24 I met Mr. Burks, and on his invitation I went to his house on Monday. Saturday evening I went to Emma Robinson's. I asked her if I could get a place there to stay. She said I might stay, and see what her husband might say; if he said it would be all right, then I could stay. I was on the bed in the front room, when there was knocking on the door. Emma Robinson came in the room and opened the door. Her husband came in. He asked me what I was doing. Told him I was going to sleep there. He grabbed me by the arm, and raised me up, and said, 'You damned son of a bitch!' He then plunged a knife in my side. I grappled with him, and grabbed for the knife. The woman called him to wait. When he jumped on me she ran out. Then I grabbed for the knife. I caught the blade. I then caught him by the wrist, keeping him from cutting me. We began struggling, and struggled out of the room. I was in great pain, and growing very weak. We continued struggling, I keeping hold of his hand all the time. We kept this up across the railway track, and I was growing mighty weak and faint. When we crossed the railway track we fell, him on top; and I was still growing awful weak. In the fall, I got one of his fingers in my mouth. I then summoned up all my strength and held on to his finger. We con-

tinued struggling and scuffling for the knife. Our hands were full of blood. At last his hand slipped, and I got the knife. As soon as I got the knife I began striking—first one way and then another. I was very weak and faint, and did not notice where or how I was striking until the man rolled off of me. I got up and called for A. J. Smith, and told him that I had been cut by a man I didn't know, and that I was badly hurt, and wanted to be taken down town. [The defendant here exhibited his hands to the jury.] I have never seen Emma Robinson since until I saw her in the court room, and I have never seen the girl Mamie since.''

Cross-examined: ''I don't know that I killed William Robinson, of my own knowledge. I don't know who the man was. I don't know how I cut the man. I don't know that I cut him on the back. I don't know that I cut his throat. I don't know that I disemboweled him. I don't know how I cut him. I do know, when I got the knife, I cut upward. I don't know how strong a man must be to be the under dog in a fight, then, with a dull pocket-knife, to cut a man's throat, disembowel him, and stab him five times in the breast and as many times in the back. I can't tell if I did very well or not, for a man that was growing so weak and faint. I don't know how faint and weak a man must grow before he can fail to cut a man's head nearly off with a pocket-knife. Emma Robinson is mistaken when she says her husband didn't hold me up and cut me in the side while she was there; and she is mistaken when she says her husband didn't have anything in his hand. John Elliott is also mistaken when he said I told him a man had stuck a knife in my belly, like lightning, while I was asleep on the bed. Mamie Robinson was in the room when her father came in. She didn't see me behind the door, and didn't see me go behind it just before her mother opened it. I first met Emma Robinson last August. I was at her house four or five times. I never got acquainted with her husband. I was doing night work at this time with the Bella Union Theater. I wanted to get some place to stop, and didn't know where to find a place, when I went to Emma Robinson's. I was waiting for her husband to come home, to ask him if I couldn't stay all night. When he came I didn't know him. Emma Robinson was living some distance from the place where I was working. I don't know what I did with the knife, and don't know who I gave it to. I don't know the knife in evidence is not mine. I don't know if that is the knife I was cut with, and don't know if that is the knife I did the cutting with. I don't know who it was crying, 'Oh! Oh! Help!' It might have been me. I didn't undress when I was lying on the bed. My hat was on the trunk. I had on a coat. The deceased was on top of me, and right over me, when we fell at the railway track. I have got the same coat on that I had that night. I can't show the jury any blood spots on it. I had left it at the house. I didn't have time to

take my coat off after the fight began. I had it off when Robinson came in. I laid down without it. If a man's throat was cut over me, in the position that I say the deceased was, I don't know if the blood would fill my face and eyes, and all of my upper clothing. My shirt and face had no blood on them. The blood was on my hands and on my trousers. I had been to see Emma Robinson three or four times during the week of the killing. I just went to see her to talk. I was just visiting around. I had been at Mrs. Burks' four or five times."

Mamie Robinson, a witness for the defense, testified: "I am 11 years old. I was at home the night papa and Mr. Franklin had the fight. My papa's name was William Robinson. My mother's name is Emma Robinson. I was in the back room with mamma. Mr. Franklin was in the front room. Papa knocked at the door and woke me up. I went with mamma when she went to the door to let papa in. When papa came in he began fussing and fighting with Mr. Franklin. Papa grabbed him around the arms, and mamma carried us out of the window to Mrs. Burks'."

Cross-examined: "The door had a thumb-latch. When the door was latched you could not open it from the outside. When mamma opened the door Mr. Franklin was behind the door. He went behind it just as mamma opened it." [The witness here illustrated the position of defendant behind the door when the same was opened, showing him to occupy a position where deceased could not see him as he entered.] The witness, continuing, said: "When papa came in Mr. Franklin came from behind the door and went toward him, and then papa commenced the fuss. Papa didn't have anything in his hands. He caught Mr. Franklin by the shoulder. Mr. Franklin was not cut while he was in the room. I didn't see any knife at all. I didn't see Mr. Franklin have any knife, either. I know papa's knife. It has an iron handle. It was an IXL knife; it had IXL on the blade and the handle." The knife heretofore in evidence was here shown the witness, who said: "This is not papa's knife. Papa's knife was much smaller, and this knife has a wooden handle, and no IXL on it."

Isaac Burks, a witness for the State, testified: "I knew deceased. We were working at the same place—at Mr. George's. I know his wife. On the evening of the night he was killed I brought a message from him to his wife—that he would be home that night. I delivered it to her, and in reply she said: 'I know it; and if he don't come home all right my sporting man will be here and do him up.'"

Cross-examined: "I delivered this message to her about 6 o'clock in the evening. I then went down town. I took several drinks down town. I may have got a little full. I went home to supper; took a pint of whisky home with me, and took another drink; got my supper and went to bed all right. Emma Robinson woke myself and my wife up about half-past 2 o'clock. She said Billy and Franklin were fight-

ing, and wanted me to go down and see about it. My wife got up first and let her in. When I got up 1 lit the lamp and set it down by the clock, and it was half-past 2. I can tell the time, and know it was half-past 2. Franklin had been at my house. I invited him. He said he was tired, and I made up a cot for him, and when my wife came home she made him get up and leave. She told him that she did not want him about the place; that he had tried to be too familiar with her. She hadn't told me so before, but I heard her tell him when she made him leave. I told several persons next morning what Emma Robinson had said about her sporting man doing him up. Mary Jones, A. J. Smith, Charley Moore, and several others were present when I told about it."

Redirect: "I hadn't taken a drink when I delivered that message. I had just come home from work, and was going to put up my team. I have known Robinson for fifteen years. I think he was a little taller than defendant. When Emma came to my house, I heard ˙cries of 'Oh! Oh! Oh!' and I knew it was Billy Robinson's voice; and I said, 'There, that is Billy, now.' I knew his voice, and I said to Emma, 'This is all for your doings.' "

We have given in full the facts in this case for the purpose of disclosing two omissions in the charge, viz., a charge presenting manslaughter under a certain state of facts not referred to in the charge given, and self-defense. The killing occurred at the house of deceased, about 2 o'clock at night. There were two rooms in the house. In one slept the wife and daughter; in the other the defendant had laid down on the bed. Deceased came home, and immediately the fight began. The theory of the defense is, that the defendant was lying on the bed, and deceased rushed upon and stabbed him while on the bed. The defendant was stabbed in the bowels. The State contends that the fight began at the door; that defendant, when he heard deceased knock at the door to be admitted into the house, concealed himself behind the door, and when deceased entered sprang upon him with a knife; that deceased fled, pursued by defendant, to the railway track, and there defendant committed the homicide by cutting deceased's throat. All of the testimony shows that deceased fled from the house, and that defendant pursued, striking him in the back with a knife, and finally, at the railway track, cut his throat, killing him instantly. Appellant swears that he was stabbed while on the bed, and that this was the beginning of the fight. Now, there are some indisputable and unquestioned facts: (1) That at sometime in the fight defendant received a very dangerous incised wound in the bowels; (2) that he had been lying on the bed; (3) that there was blood on the bed, blood on the floor, lots of it. Do not these facts imperatively demand·a charge to the effect that if deceased stabbed defendant while the latter was in the bed, and then abandoned the fight, and defendant pursued and killed him, yet if the jury should believe that the killing was the result of passion

produced by the cutting, then they should find him guilty of man-slaughter? We do not mean here to prescribe the form for such a charge. This phase of the case was not presented to the jury by the charge.

We will submit here some observations upon the charge of the court upon the law of justifiable homicide. The court charged: "But this perfect right of self-defense can only obtain where the party resorting to it is wholly free from blame in the transaction. A perfect right of self-defense can only obtain and prevail where the party acted from necessity, and is wholly free from wrong or blame in occasioning or producing the necessity which required his action, viewed from his standpoint. If, however, viewed from his standpoint, he was himself violating any law, or in the act of violating the law, and on account of his own wrong was placed in a situation where it became necessary for him to defend himself against an attack made upon him, which was superinduced or created by his own wrong—viewing the matter from his standpoint, then, the right of self-defense is limited. In other words, if one by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he should take life, then the law imputes to him his own wrong and its consequences, to the extent that they may be and should be considered in determining the grade of the offense, which, but for such acts, would never have been occasioned; and such a condition of things is termed an 'imperfect right of self-defense.' If defendant went to the house of deceased for the purpose of killing deceased or doing him great bodily harm, and thereby produced the occasion of the killing, the homicide would be murder in the first or second degree, according to the facts in evidence. If, on the other hand, the defendant went to the house without any intent to injure the deceased, but his presence in said house was wrongful, and produced the occasion which made it necessary to kill deceased, to save his own life, or to protect himself from serious bodily harm, then defendant's right of self-defense would be imperfect, and not affording a complete justification of the homicide, and the offense would be manslaughter. Hence, if defendant produced the occasion in order to have a pretext for killing deceased or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the difficulty. But if he provoked the contest or produced the occasion without any felonious intent—intending, for instance, the perpetration of a wrong of a minor degree, termed a 'misdemeanor'—the final killing in self-defense, under such a state of facts, will be manslaughter only."

Some of these propositions are correct, and some are not, because wanting in specification. A party may have a perfect right of self-defense, though he may not be wholly free from blame in the transaction; the question being, what is the nature of the blame? If the blame

or wrong was not intended to produce the occasion, nor an act which was, under the circumstances, reasonably calculated to produce the occasion or provoke the difficulty, then the right of self-defense would be complete, though the act may not be blameless. But if the act was a violation of the law, and was reasonably calculated to produce the occasion, then the right of self-defense would be abridged. But the objection to the charge is, that it is too general. The wrongful act is not named, and the jury might believe certain acts as wrongful which are not such in law. The defendant may have gone to the house without any intent to injure him, and yet his presence there might have been in one sense wrongful, but not illegal, nor calculated to provoke the occasion. This being the case, his right of self-defense would not be abridged. The charge, it is true, restricts the wrong to a misdemeanor, but the acts constituting the misdemeanor are not disclosed. If appellant was taken in adultery with the wife of deceased, and the deceased attempted to kill him, and defendant killed deceased to save his own life, under the circumstances in this case, of what offense, if any, would he be guilty? This question is not presented in the record, and we make no answer thereto. If he was at the house of deceased for the purpose of having carnal knowledge of his wife, and deceased, believing this to be his purpose, attempted to kill him, and defendant killed deceased to save his own life, what, then, would be his offense? This supposed case assumes that defendant did not intend to provoke the occasion; was not in the same room with the wife; was not committing an offense against the code of this State. But the theory of the State is, that he had been guilty of adultery by habitual intercourse with the wife. He was in the house of deceased under very suspicious circumstances. His acts were wrongful, though not illegal. What would be his offense, under these circumstances? This question is very hard to solve; but we believe, under the above state of case, he would be guilty of manslaughter. Upon what principle? (1) Because his acts were wrongful, though not criminal? Under the circumstances, they were most fearfully calculated to produce the occasion or provoke the difficulty, especially when taken in connection with the conduct of the wife at the time deceased knocked at and entered the door. (2) The reasonable and natural consequence of such conduct was to provoke the difficulty, and in fact it did provoke it; and defendant should be held responsible for his reckless and daring acts.

We presume the trial judge was referring to this conduct of defendant in the first paragraph of charge 3. If so, the acts and conduct of the defendant should have been hypothetically presented to the jury. This was rendered more essential by the testimony of the defendant and the wife. They both deny any criminal act. She testifies that the defendant came to her house about 5 o'clock in the evening; said he wanted a place to board; said he was tired, and wanted a place to

stay. She said: "You must see my husband. He will be at home this evening, and you can see him about sleeping here." Defendant was asleep in the front room. His conduct toward her was all right. He was not undressed when she lay down. She was in the back room with the children. He was in the front room. Let us suppose that defendant was at the house simply for the purpose of securing some place to sleep that night, and by permission of the wife of deceased he had laid down on the bed in the front room to await the coming of the husband. While such conduct may have been imprudent, still he would not have been guilty of even a moral offense or wrong; and if assaulted by deceased while on the bed, and to save his own life he killed deceased, he would have been justified.

This phase of the case was not presented to the jury, though called to the attention of the court by counsel for defendant. We are of opinion that judgment should be reversed and the cause remanded, for the errors and omissions in the charge noticed above.

*Reversed and remanded.*

Judges all present and concurring.